IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| MICHAEL S. BASKIN, et al., | ) | CIVIL NO. 20-00216 WRP |
| | ) | |
| Plaintiffs, | ) | |
| | ) | FINDINGS OF FACT AND |
| vs. | ) | CONCLUSIONS OF LAW |
| | ) | ON DEFENDANT'S |
| EC PAIA LLC, | ) | COUNTERCLAIMS |
| | ) | |
| Defendant. | ) | |
| | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
ON DEFENDANT'S COUNTERCLAIMS**

**PROCEDURAL HISTORY**

This Order relates to the second phase of trial between the parties:

Plaintiffs Michael S. Baskin (Mr. Baskin), Paia Properties, LLC, Seashore

Properties LLC, Paia Bay Properties LLC, and Paia Park, LLC (collectively, "the

Baskin Parties") and Defendant EC Paia LLC (EC Paia).  The parties entered into

two, pertinent contracts related to an investment opportunity involving the

development of approximately 340 acres of land in Paia, Maui (Property).  The

main contract between the parties and involving the Property during the second

phase of trial was referred to at trial as the "Land Agreement."  Another contract

referenced during trial was referred to as the "Parking Lot Agreement."  The Land

Agreement and Parking Lot Agreement are collectively referred to as "the Agreements."

In the first phase of trial, the Court weighed evidence and testimony as to the Baskin Parties' breach of contract claims against EC Paia related to the Land Agreement for the Property. The Court, following the Baskin Parties' case-in-chief, granted EC Paia's Rule 52(c) motion for a judgment on partial findings as to the Baskin Parties' contract claims. The Court entered judgment for EC Paia and the judgment was upheld by the Ninth Circuit.[1]

EC Paia also asserted counterclaims against the Baskin Parties for (1) fraudulent/intentional misrepresentation and failure to disclose (Count I) and (2) negligent misrepresentation and failure to disclose (Count II). *See* ECF No. 42. EC Paia alleged misrepresentations and omissions by the Baskin Parties that induced EC Paia to enter into the Agreements.

Following the first phase of trial and based upon the Baskin Parties' arguments during the trial, the Court invited a summary judgment motion from the Baskin Parties and ultimately dismissed EC Paia's counterclaims of misrepresentation as non-actionable, forward-looking statements that EC Paia did not reasonably rely upon. The Ninth Circuit disagreed and remanded. *See* ECF

---

[1] In its October 26, 2023 memorandum disposition, the Ninth Circuit affirmed this Court's prior rulings and judgment against the Baskin Parties on their claims against EC Paia. *See* ECF No. 250 at 1-7.

No. 250.  The second phase of trial concerning EC Paia's counterclaims for misrepresentation followed.

EC Paia asserted that it relied on misrepresentations and omissions by the Baskin Parties when EC Paia entered into and performed under the Agreements, including the payment of $4 million to Mr. Baskin, the promise to convey one residential lot, one commercial lot, and parking lot to him, and other non-monetary terms.  As set forth in more detail in the Court's findings below, EC Paia alleged that the Baskin Parties made several misrepresentations in an investor letter, an appraisal, and in conversations with EC Paia principals including conversations immediately preceding the closing of the sale related to the Property on December 15, 2016.

The Court reconvened a non-jury trial (referred to as "the second phase of trial") on EC Paia's counterclaims from February 12 through 15, 2024. The Court hereby finds in favor of EC Paia and against the Baskin Parties on EC Paia's fraudulent/intentional misrepresentation and failure to disclose (Count I) and (2) negligent misrepresentation and failure to disclose (Count II).  The Court further details its findings as to specific misrepresentations below.

Generally, the Court heard and weighed the evidence and testimony presented at the first and second phases of trial, observed the demeanor of witnesses, evaluated their credibility and candor, and heard and considered the

parties' respective arguments.  The Court makes the following Findings of Fact[2] as to the second phase of trial.[3]

## FINDINGS OF FACT

Most of the findings of fact below were undisputed at trial.  Beginning with the section entitled "Credibility Findings," the Court sets out its findings on facts and issues that were contested in the second phase of trial.

**I.    Undisputed Findings**

**A.    The Parties**

Counterclaim Defendants Paia Properties, LLC, Seashore Properties, LLC, Paia Bay Properties LLC, and Paia Park LLC are Hawai'i limited liability companies.  *See* ECF No. 185, FOF 1.

Counterclaim Defendant Michael Baskin, a citizen of Hawai'i, is the sole member/manager of Paia Properties, LLC and Paia Park LLC; Paia Properties, LLC is the sole member/manager of Seashore Properties LLC; and Paia Management, Inc., a Hawai'i corporation with its principal place of business in Hawai'i, is the sole member/manager of Paia Bay Properties LLC.  *See id.*, FOF 2.

---

[2] Any finding of fact that should more properly be deemed a conclusion of law shall be so construed.

[3] The Court also incorporates by reference the findings of fact in its prior Findings of Fact and Conclusions of Law, and Order Granting Defendant's Motion Under Fed. R. Civ. P. 52(c) for Judgment on Partial Findings as to Plaintiffs' Claim for Breach of Contract.  ECF No. 185.

Counterclaim Plaintiff EC Paia is a Delaware limited liability company.  The sole owner of EC Paia is Eagle Canyon Capital, LLC, a California limited liability company.  The sole owner of Eagle Canyon Capital, LLC is Sam Hirbod (Mr. Hirbod), a citizen of California at the time this case was filed and removed to federal court.  *Id.,* FOF 3; VII-2Tr. at 5.[4]

### B.   **The Property**

The Property, composed of 339.19 acres southwest of the town of Paia on Maui and identified as Tax Map Key No. (2) 2-2-5-005:018, was previously owned by Alexander & Baldwin LLC (A&B) and used for sugar cultivation for more than 100 years.  *See* ECF No. 185, FOF 4, 5.

The Property is subject to State of Hawai'i land use designations and Maui County (the County) zoning designations.  *Id.,* FOF 6.

In Hawai'i, the State and County system of land use designations has multiple layers and can require several discretionary approvals to achieve the required consistency between layers for a proposed land use.  *Id.*, FOF 6 (citing JE-59).

The State and County designations on the Property include:

a.   Under State land use designations, the Property is in the Agricultural land use district.  VII-1Tr. at 37.

---

[4] Citations to the transcripts from the first phase of trial will be to VI-[Day]Tr., and citations to the transcripts from the second phase of trial will be to VII-[Day]Tr.

    b.    Under County zoning designations, a portion of the Property is zoned interim and the rest is zoned agriculture.  ECF No. 185, FOF 6 (citing JE-59).

    c.    Under the Maui Island Plan, different portions of the Property are designated as small town, preservation, and urban growth.  *Id.*

    d.    Under the Paia-Haiku Community Plan, portions of the Property are located in agriculture designations, heavy industrial designations, and open space designations.  *Id.*

    e.    A portion of the Property is located in the Special Management Area (SMA), and any development therein requires a SMA use permit.  *Id.*

**C.    The Baskin Parties Enter into a Purchase and Sale Agreement for the Property**

Following the closure of the last sugar mill on Maui, Mr. Baskin, who resides and owns various businesses in Paia, contacted A&B in or around the spring of 2016 to inquire about the Property.  VII-1Tr. at 7-8.

A&B did not have plans to sell the Property.  *Id.* at 8.  In June or early July of 2016, after preliminary discussions, Mr. Baskin submitted a letter of intent offer to A&B to purchase the Property for approximately $10 million.  *Id.* at 8-20. After evaluating this offer and determining that it was an above-market offer, A&B accepted the offer.  *Id.* at 10-11.

On or about July 19, 2016, the Baskin Parties entered into a Commercial Real Property Purchase and Sale Agreement (PSA) with A&B for the purchase of the Property with a closing date in November 2016.  *Id.* at 10, 13; *see also* JE-4.

6

Under the PSA, Mr. Baskin made an initial deposit of $150,000 to A&B, which was refundable during the due diligence period. VII-1Tr. at 11-12. To accommodate Mr. Baskin's request for a lengthier due diligence period, the parties agreed that the due diligence period under the PSA would end on November 1, 2016, which provided Mr. Baskin with more than 100 days to complete his due diligence. *Id.* at 12.

At Mr. Baskin's request, the due diligence period was subsequently extended to early December 2016, and the closing date was extended to December 16, 2016. *Id.* at 13-14.

At the close of the extended due diligence period, Mr. Baskin made an additional $150,000 deposit to A&B as required under the PSA. *Id.* at 14. At that time, Mr. Baskin's total deposit of $300,000 to A&B was non-refundable. *Id.*

After the extended due diligence period had ended and before the extended closing date of December 16, 2016, Mr. Baskin requested a further extension of the closing date. *Id.* at 14-15. A&B denied the request because A&B was losing confidence in Mr. Baskin's ability to close and fund the deal. *Id.*

**D.** **The Baskin Parties Propose a Joint Venture with EC Paia as the Investor**

The Baskin Parties did not close on the PSA on their own and began exploring other arrangements to purchase of the Property, including having discussions with potential investment partners. ECF No. 185, FOF 8.

On or about November 26, 2016, Dano Sayles (Mr. Sayles), a realtor on Maui, informed Mr. Hirbod of a potential investment opportunity related to the Property.  VII-2Tr. at 7-9, 124-125; *see also* JE-29.

By email to Mr. Sayles dated November 26, 2016, Mr. Baskin provided information related to his efforts to find an equity partner and requested that Mr. Hirbod sign an accompanying nondisclosure agreement (NDA).  JE-29. Also attached to the email was a document that Mr. Baskin referred to as the "Investor Letter."  *Id.*; VII-2Tr. at 8-11, 127-128.

That same day, Mr. Sayles forwarded to Mr. Hirbod the email from Mr. Baskin with the Investor Letter and NDA attached.  *See* JE-29. EC Paia signed and returned the NDA.  VII-2Tr. at 9-10, 128.

After Mr. Hirbod received the Investor Letter and NDA, Mr. Baskin informed Mr. Hirbod that he "was already under contract with [A&B] to buy the [P]roperty" and that the sale was set to close within two weeks.  VII-2Tr. at 128.

Mr. Baskin proposed a joint venture for the purchase and development of the Property wherein EC Paia would be the equity investor or funder of the project and Mr. Baskin would be the sponsor.  VII-2Tr. at 13-14, 125.

On November 30, 2016, Mr. Baskin emailed Mr. Hirbod the proposed Paia Joint Venture Agreement, which had been drafted by the Baskin Parties' outside counsel.  JE-38; VII-2Tr. at 17-19.

E.     **EC Paia Terminates the Joint Venture Negotiations**

The parties reached a preliminary joint venture agreement on December 4, 2016.  *See* VII-3Tr. at 25-26; P-13.  During this time, EC Paia's outside counsel worked with the Baskin Parties' attorneys to prepare documents for the joint venture.  VII-2Tr. at 67-68.

The Baskin Parties delayed completing the necessary documentation and tried to re-trade previously agreed deal terms while they continued to negotiate with other parties.  EC Paia and Mr. Hirbod lost confidence in the joint venture and Mr. Baskin because of delays in completing the necessary paperwork and their belief that Mr. Baskin continued to negotiate with other parties.  VII-2Tr. at 68, 138-139; *see also* P-99.

Based on this loss of confidence and information that Mr. Hirbod learned through a newspaper article about Mr. Baskin's alleged land use violations and tensions with the community, on December 14, 2016, Mr. Hirbod decided to cease negotiations with the Baskin Parties.  VII-2Tr. at 68-69, 139; JE-50; Ex. AU.

F.     **To Avoid the Loss of the Deposit with A&B, the Baskin Parties Propose an Alternative Deal for an Assignment of the PSA**

After Mr. Hirbod terminated the joint venture negotiations, the Baskin Parties represented to Mr. Hirbod that other investors were still interested and that Mr. Hirbod should complete the deal because of the near-term profitability of the proposed development of the Property into agricultural lots followed by

development of the Expansion Growth Area.  *See* VII-2Tr. at 140-151; P-99; Ex. AX; *see also* VII-2Tr. at 69.

On December 14, 2016, Mr. Baskin sent Mr. Hirbod and his counsel an e-mail stating, "The new purchase land for 21 housing lots will easily be approved and worth 45 Million and the next step of rezoning the commercial section will more sometime [sic] but will be worth a significant amount (more than 100 million)."  Ex. AX at ECP-001441; *see also* VII-2Tr. at 145-146, 148.

After Mr. Hirbod confirmed that he would not proceed with the joint venture, Mr. Baskin asked Mr. Hirbod to consider other possible arrangements. VII-2Tr. at 151-152.  Mr. Hirbod responded that he would be willing to listen if Mr. Baskin had a proposal to make.  *Id.*

The next day, December 15, 2016, Mr. Baskin contacted Mr. Hirbod to propose that EC Paia purchase the rights to the PSA from the Baskin Parties along with the Baskin Parties' work product for the development of the Property. VII-2Tr. at 152-154.  During the phone call, Mr. Baskin admitted to Mr. Hirbod that there were no other viable investors and that he would lose both the Property and his deposit if they could not reach a deal.  *See* VII-2Tr. at 153-154.

Prior to the call in which this proposal was made, Mr. Baskin texted Mr. Hirbod, "Keep in mind the appraisal."  P-99 at PP003054; *see also* VII-2Tr. at

152-153.  Mr. Baskin admitted that his text was essentially telling Mr. Hirbod "that the property is worth $100 million as appraised[.]"  VII-4Tr. at 122.

Mr. Hirbod offered Mr. Baskin $1 million and a parking lot license for the assignment of the PSA.  VII-2Tr. at 153-154, 167; VII-3Tr. at 75-76.

To convince EC Paia to increase the price that it would pay to the Baskin Parties for the assignment of the PSA, Mr. Baskin represented to Mr. Hirbod that Randy Endo (Mr. Endo) of A&B had told Mr. Baskin that A&B had a "backup offer" in place for the Property such that if Mr. Hirbod did not agree to the assignment of the PSA from the Baskin Parties, Mr. Hirbod would not have another opportunity to purchase the Property.  VII-2Tr. 154, 157-170; VII-3Tr. at 85-86.

Based on Mr. Baskin's representation that there was a backup offer, Mr. Hirbod agreed to increase the proposed payment from $1 million and a parking lot license to $4 million, a parking lot license, and the transfer of a residential lot and a commercial lot once the lots were developed.  VI-2Tr. at 175; VI-3Tr. at 97-98; VII-2Tr. at 153-156, 167; VII-3Tr. at 84-85.  This agreement resulted in the parties entering into the Land Agreement and the Parking Lot Agreement.  VII-2Tr. at 154-156, 160.

Pursuant to the Agreements, EC Paia agreed to: (a) pay Baskin $4 million; (b) reimburse Baskin for his $300,000 deposit and $65,762.39 for

expenses that could be substantiated at the time of closing; (c) transfer one

Residential Lot and one Commercial Lot (per the terms of the Land Agreement);

and (d) grant certain Baskin Parties a license to construct a parking lot on the

Property (per the terms of the Parking Lot Agreement).  *See* J-28; P-14; *see also*

VII-2Tr. at 156-160.

**G.  Mr. Baskin's Statements in the Investor Letter, the Appraisal, and His Discussions with EC Paia Principals Were Compelling to an Equity Investor**

As set out above, the discussions between the Baskin Parties and EC

Paia about the Property evolved during the few months at the end of 2016,

resulting in EC Paia purchasing the Baskin Parties' option to purchase the

Property.  Ultimately, after negotiating terms of the sale, EC Paia agreed to buy the

Baskin Parties' option to purchase the Property.  The evolving negotiations, which

included negotiations to enter into a joint venture, affected EC Paia's evaluation of

the project.  VII-2Tr. at 125.  EC Paia's shift from potential investor to purchaser

of the Property similarly affects the Court's analysis of the statements as actionable

misrepresentations.

Mr. Hirbod explained that in contrast to a seller-purchaser transaction

where the seller typically does not make representations regarding expected use,

density, development, or risk of the property or project, it is common for a sponsor

to make such representations to a proposed equity partner.  *Id.* at 126.

Hamed Adib (Mr. Adib) of EC Paia explained, "[I]n a joint venture structure, we always believe the sponsor for what they are saying the project is, for what they're saying that they can do as part of the project, how long it's going to take, how much it's going to make, and what it is that they can accomplish. That's why you have a JV structure where you rely on an operating partner who knows what they're doing and has the experience to say what they can do." VII-2Tr. at 67.

As a co-owner of the project, Mr. Baskin faced personal risks if his representations were inaccurate. VII-2Tr. at 21.

Mr. Adib explained that he believed Mr. Baskin's representations regarding his experience and that Mr. Baskin had vetted the details that he represented in the Investor Letter and at meetings "because when someone makes an investment offering that has specific representations, anyone that has had experience in real estate development would know that they've done the work, they know what they're talking about, and they have a level of confidence where they've put money in, and they're proposing to put years of time in that will only be returned upon successful completion of what they're telling us they can achieve in the project." VII-2Tr. at 44. The only way that Mr. Baskin, as the sponsor, "was going to make any money out of this project was after successful execution of the plan that he had laid out, all of the investor money under the pref [sic] of the

joint venture would have to be repaid, and then that's when Mr. Baskin would first find his profit.  I could not imagine a scenario in which someone would fabricate information for -- to get an investor involved, knowing that after a few years of operating the property, it would become apparent that there were things that were said that were untrue."  *Id.* at 67.

For EC Paia's principals, Mr. Baskin's investment of the $300,000 down payment and what he had purported to spend on consultants also showed that "he's got skin in the game."  *Id.* at 45.

Mr. Hirbod explained, "As an equity investor, the sponsor knows the specifics.  What am I interested in[?] . . . I asked what's discretionary, what's certain, what's administrative, and in what timeline."  VII-3Tr. at 40; *see also id.* at 41 ("[T]his is what I always do.  What's administrative, what's discretionary, what's certain[.]").

Numerous statements within Mr. Baskin's Investor Letter, the Property's Appraisal, and Mr. Baskin's conversations with EC Paia principals were compelling to an equity investor, including its evaluation of the investment opportunity, entitlements, availability of water, use, density, timeline, and valuation of the Property.  *See, e.g.*, VII-2Tr. at 16-17, 21-29, 31-34, 36-43, 48.  As detailed below, the Court finds that some of these statements were intentional or negligent misrepresentations and other statements were not actionable.

14

## II.   <u>Credibility Findings</u>

Many of the Court's findings turn on the credibility of the principals, Mr. Baskin and Mr. Hirbod, as well as the witnesses each side called at trial.

The considerations set forth in the Ninth Circuit's Model Civil Jury Instructions assist the fact finder weighing the credibility of witnesses.  *See* Ninth Cir. Model Jury Inst. 1.14 (Credibility of Witnesses).  Specifically, the fact finder "may take into account: (1) the opportunity and ability of the witness to see or hear or know the things testified to; (2) the witness's memory; (3) the witness's manner while testifying; (4) the witness's interest in the outcome of the case, if any; (5) the witness's bias or prejudice, if any; (6) whether other evidence contradicted the witness's testimony, [including when]… a witness may say something that is not consistent with something else he or she said; (7) the reasonableness of the witness's testimony in light of all the evidence; and (8) any other factors that bear on believability." *Id.*

Here, the Court heard testimony from EC Paia's principal, Mr. Hirbod, in both phases of trial.  In the second phase of trial, as the Court did in the first phase, the Court finds Mr. Hirbod of EC Paia credible.  The Court finds Mr. Hirbod credible when he testified about Mr. Baskin's statements that EC Paia alleged were misrepresentations, as well as EC Paia's and his personal reliance on those misrepresentations.

Specifically, the Court finds Mr. Hirbod credible in his testimony that:

a. Mr. Hirbod, as a potential equity investor, viewed Mr. Baskin as the sponsor of the project related to the Paia Property.

b. Mr. Hirbod believed that Mr. Baskin was a successful, local businessman who had specialized knowledge about Paia, Maui, development generally on Maui, and the potential for the project.

c. Mr. Hirbod generally believed Mr. Baskin's statements about development potential, timelines, and return on investment for the project, as well as entitlements, availability of water, and capacity for a boutique inn.

d. Mr. Hirbod, at some point around December 14, 2016, "lost confidence in Baskin as a potential partner" but remained interested in the Property based upon Mr. Baskin's work and statements.

Based on their manner of testifying, memory, knowledge, and overall demeanor, the Court finds the testimony of the additional witnesses for EC Paia credible, including Randy Endo, William Spence, Rory Frampton, and Hamed Adib.

On the other side of the transaction for the Property, the Court again does not find Mr. Baskin credible. The Court, as the trier of fact, finds Mr. Baskin

16

not credible for several reasons and in multiple, key aspects of his testimony.  Mr. Baskin was not credible as a witness because of: (i) his manner of answering questions; (ii) how often his trial testimony conflicted with his prior statements; and (iii) his responsiveness (or lack of responsiveness) to questions from opposing counsel on cross examination, particularly when Mr. Baskin turned to other topics or other information on an exhibit rather than respond to the questions posed to him.

Mr. Baskin's testimony as to several key issues in the second phase of trial was not believable.  EC Paia witnesses and Mr. Baskin testified differently about several topics in their interactions about the Property.  The Court specifically finds Mr. Baskin's contrary testimony to be less credible in comparison to EC Paia's witnesses, specifically Mr. Hirbod.  Mr. Baskin was impeached numerous times during his testimony in the first and second phases of trial.  Mr. Baskin made inconsistent testimony regarding whether or not he told Mr. Hirbod that A&B had a backup offer.  Mr. Baskin refused to give a direct answer to many simple questions.  Based on his inconsistent testimony, manner of testifying, memory, knowledge, and overall demeanor, the Court finds that Mr. Baskin was not credible at either phase of trial.

The Court analyzed Mr. Baskin and the Baskin Parties' specific statements below.

**III.**   **After Purchasing the Property, EC Paia Alleged that Several Statements by the Baskin Parties Leading up to the Purchase Were Material Misrepresentations that EC Paia Had Reasonably Relied On**

**A.**   **Baskin Parties' Statements at Issue**

EC Paia alleged in its counterclaims that several statements by the Baskin Parties leading up to the purchase were material misrepresentations. EC Paia's alleged misrepresentations by the Baskin Parties could be enumerated and subdivided many different ways. The Court grouped the alleged misrepresentations into the following six categories: (1) the agriculture lots (AG Lots); (2) the Urban Growth Area; (3) Affordable Housing; (4) the Boutique Inn; (5) Usable Water Source; and (6) the Backup Offer. The Court then evaluated several statements under each category as intentional or negligent misrepresentations under the applicable law. The Court subdivided each of the numbered categories into statements, by Mr. Baskin or the Baskin Parties, that the Court finds could have been intentional or negligent misrepresentations. The Court then highlighted the operative language of each representation in **bold**. To the extent a specific, alleged statement is not included below or discussed in these findings, the Court deemed it immaterial or redundant with those discussed.

| Mr. Baskin's or Baskin Parties' Statement that: | |
|---|---|
| 1 | **AG Lots:**<br>The Property has 300 acres with "a current development entitlement" of up to 21 Agricultural Lots.  JE-29 at ECP-001454.<br><br>"Given existing entitlement rights, the agricultural subdivision development process for these home sites is relatively easy to execute and has an estimated execution time horizon of about two to three years."  JE-29 at ECP-001465.<br><br>The agricultural lots could be created and begin generating revenue within 18 months, with proceeds of approximately $41 million within 2.5 years.  JE-29 at ECP-001466. |
| | 1a.   "**300 acres … [and] up to 21 Agricultural Lots**" |
| | 1b.   "**Given existing entitlement rights**, the agricultural subdivision development process for these home sites is **relatively easy to execute**" |
| | 1c.   "**… estimated execution time horizon of about two to three years**." |
| | 1d.   begin generating revenue within 18 months, with proceeds of approximately **$41 million within 2.5 years**. |

| 2 | **Urban Growth Area**<br>The Property has "40 acres that are designated for inclusion in the 'Paia Expansion Growth Area' by the County of Maui" and this expansion area (Urban Growth Area) is "essentially pre-approved for development as a high-density residential and commercial district."  JE-29 at ECP-001454.<br><br>"The County Plan specifically anticipates approximately 275 residential units and approximately 140 commercial lots, along with related open space and amenities" in the Urban Growth Area.  JE-29 at ECP-001454. |
|---|---|

"With respect to the Growth Area Lots, the development expense is estimated to be slightly higher, with an anticipated entitlement of about 140 lots. The subdivision development process of the Growth Area Lots is a somewhat lengthier process due to the high-density nature of the planned uses, and has an execution time horizon of about 5 years."  JE-29 at ECP-001456.

The lots in the Urban Growth Area could be developed and sold within 2.5 years, with estimated proceeds of $59 million.  JE-29 at ECP-001466.

The lots in the Urban Growth Area could be developed and sold within 2.5 years, with estimated proceeds of $59 million. These total for the project values and timelines supported the representation that total proceeds within 2.5 years would be more than $113 million, giving the project a present value of $23 million.  JE-29 at ECP-001466.

| | | |
|---|---|---|
| | 2a. | **"essentially pre-approved** for development as a high-density residential and commercial district." |
| | 2b. | "**40 acres** that are designated for inclusion **in [the Urban Growth Area]**" |
| | 2c. | "**The County Plan specifically anticipates approximately 275 residential units and approximately 140 commercial lots**, along with related open space and amenities" in the Urban Growth Area. |
| | 2d. | "With respect to the Growth Area Lots, the development expense is estimated to be **slightly higher** … **a somewhat lengthier process** … and has **an execution time horizon of about 5 years**." |
| | 2e. | could be developed and sold **within 2.5 years, with estimated proceeds of $59 million** …[and the] **total proceeds within 2.5 years would be more than $113 million**, giving the project a present value of $23 million. |

20

| 3 | **Affordable Housing** |
|---|---|
| | "Current entitlements allow for approximately 385 residential units on the Property as a whole.  Under current guidelines, dedicating 25% of those units to affordable housing stock would enable the development process waivers and advantages so that, for example, one 15-acre Ag Lot could be developed with perhaps 100 affordable housing units, and Growth Area commercial lots could support a variety of zero lot line, multi-family units." JE-29 at ECP-001455. |
| | 3a.   "**Current entitlements** allow for approximately **385 residential units** on the Property as a whole. |
| | 3b.   **Under current guidelines**, **dedicating 25% of those units to affordable housing stock** would enable the development process waivers and advantages. |
| 4 | **Boutique Inn** |
| | "The roughly 40-acre Growth Area lots will support dense commercial and multi-family residential development that would provide an extension of the existing Paia town commercial area.  **Options would include . . . small specialty Boutique Inns**[.]"  JE-29 at ECP-001455. |
| | A hotel or inn could be developed on the Property, with estimated proceeds of **$13 million within 2.5 years**.  JE-29 at ECP-001466. |
| 5 | **Usable Water** |
| | The Property contains well sources providing **substantial amounts of water for use in the development of the Property**."  JE-29 at ECP-001453. |
| | The plan concept and maps included with the investor materials highlighted **"existing wells."**  JE-29 at ECP-001463. |

| 6 | **A Backup Offer**<br><br>Mr. Baskin testified that, after Mr. Hirbod offered $1 million for assignment of the PSA, he convinced Mr. Hirbod that there were other backup offers to purchase the Property.  VI-2Tr. at 175.<br><br>Mr. Hirbod testified that Mr. Baskin told him there was a backup offer to purchase the Property and Mr. Hirbod relied on that statement.  VII-2Tr. at 155-156, 160, 169.<br><br>Mr. Endo testified that there was no backup offer to purchase the Property and that no one from A&B told Mr. Baskin there was a backup offer.  VII-1Tr. at 17-18. |
|---|---|

B. **Analysis of the Baskin Parties' Statements and EC Paia's Reliance**

1. *Category 1: Statements about AG Lots*

In the Investor Letter, the Baskin Parties represented, "[T]he Ag Lots comprising about 300 acres of agricultural land has a current development entitlement of up to 21 ocean-view lots with a minimum lot size of two acres."  JE-29 at ECP-001454.  The plan concept and maps included in the Investor Letter highlighted the "current development entitlement" of up to 21 agricultural lots.

In the Investor Letter, the Baskin Parties also represented that "[g]iven existing entitlement rights, the agricultural subdivision development process for these home sites is relatively easy to execute[.]"  JE-29 at ECP-001456.

In meetings and other communications, Mr. Baskin reiterated the representations made in the Investor Letter that the current development

entitlements allowed for 21 agricultural lots and would be relatively easy to execute.  *See* VII-2Tr. at 26; VII-3Tr. at 69; Ex. AX (email from Mr. Baskin to Brian Lee and copying Mr. Hirbod and Mr. Adib) ("The new purchase land for 21 housing lots will easily be approved and worth 45 Million[.]").

In discussing the "current development entitlement" representation, Mr. Adib testified: "Mr. Baskin[] explained that because of the way that the current County rules were set up, that this was a [by] right process, that all that had to be done was filing of the necessary work, and that the 21 Ag lot subdivision would be approved."  VII-2Tr. at 26; *see also id.* at 40 (Mr. Adib explaining that his understanding of the phrase "relatively easy to execute" was based on Mr. Baskin's explanation "that this was a by-right entitlement" and "[t]hat all you had to do was . . . go through the process and that the 21 Ag lot subdivision would be approved").  Mr. Adib explained that Mr. Baskin "was adamant that this was a non-discretionary approval[.]"  *Id.* at 26.

At the time these representations were made, there was in fact no entitlement or approval for a specific number of agricultural lots.  *See* ECF No. 185, FOF 15-16.

Based on the statutory sliding scale set forth in Maui County Code chapter 19.30A, there is a maximum lot allocation of 21 Agricultural Lots on the entire Property.  The allocation is the maximum possible agricultural lots and does

not represent an entitlement to or approval of a subdivision.  ECF No. 185, FOF 15

(citing VI-2Tr. at 116 & Maui County Code § 19.30A.030).

Mr. Baskin described a "current development entitlement" for

agricultural lots on the Property but that was inartful and inaccurate.

From the first phase of trial, the Court heard testimony that the

Property is located within the SMA area and a SMA major permit would need to

be obtained to subdivide the approximate 306 acres of the Property into

agricultural lots.  *See* ECF No. 185, FOF 17; VII-1Tr. at 38, 83-84, 86.

A SMA major permit requires a discretionary approval from the Maui

County Planning Commission (Planning Commission), which is made of a board

of community volunteers.  VII-1Tr. at 39-40.  The process is uncertain and

requires, among other things, environmental review and a public hearing.  *See id.*

at 120-121.

In 2016, William Spence (Mr. Spence) was the County Planning

Director.  During the first phase of trial, Mr. Spence explained that members of the

community have the right to intervene and request a contested case in SMA major

permit proceedings. *Id.* at 49.  In 2016, Mr. Spence would have anticipated a

contested case for the approval of an SMA major permit for the Property because

the residents of the area and community groups, such as the Sierra Club and Maui

Tomorrow, are protective of the small-town character and want growth to go

someplace other than in Paia Town or rural areas.  *Id.* at 50, 55.  Mr. Spence further noted that "public testimony plays a disproportionate part in the decision-making process with the Planning Commission."  *Id.* at 41.

The only alternative to obtaining a SMA major permit is first performing a large lot subdivision to carve out the SMA, which is the option EC Paia ultimately pursued.  *See* ECF No. 185, FOF 17, 27-28; VII-1Tr. at 41-42.  The large lot subdivision required creating a separate lot that carved out the SMA and Expansion Growth Area and two additional separate lots, which three lots cannot be used as agricultural lots, resulting in the maximum allocation of 18 agricultural lots.  VII-1Tr. at 79, 134; *see also* VI-2Tr. at 115-116; P-91 (map depicting the four lots in the large lot subdivision).

Mr. Hirbod said he relied on the representations set forth above and testified: "Because we went in there understanding and believing that the discretionary elements were done, and that, at a minimum, the Ag lot portion would be administrative[.]"  VII-2Tr. at 162-163; *see, e.g.*, VII-2Tr. at 150.

As of the second phase of trial, EC Paia is still waiting for final approval of an 18-lot agricultural subdivision.  VII-3Tr. at 47.

### 2.    *Category 2: Statements about the Urban Growth Area*

The Baskin Parties represented that approximately 40-acres of the Property was designated for inclusion in the "Paia Expansion Growth Area," that

the Expansion Growth Area was "essentially pre-approved" for development, and that 275 residential units and 140 commercial units were possible in the Expansion Growth Area.

In the Investor Letter, the Baskin Parties stated:

> 1. "Of greatest and unique importance, the Property also includes approximately 40 acres that are designated for inclusion in the 'Paia Expansion Growth Area' by the County of Maui as a part of the Maui County General Plan 2030 adopted in 2015 and intended to guide growth for the next fifteen years." JE-29 at ECP-001454 (citing to an excerpt of the Maui County General Plan).

> 2. "The net result of this is that the Property within the Expansion Growth area has been designated and essentially pre-approved for development as a high-density and residential and commercial district." *Id.*

> 3. "The County Plan specifically anticipates approximately 275 residential units and approximately 140 commercial lots" in the Expansion Growth Area. *Id.*

In his discussions with Mr. Adib and Mr. Hirbod, Mr. Baskin reiterated the representations made in the Investor Letter. Mr. Adib testified that Mr. Baskin "regularly referenced the fact that the County had already approved the expansion growth area, and that meant that the County had already decided that this is where downtown Paia was going to grow and that someone would have to do the work necessary to secure the entitlements, but that it was essentially preapproved because the County had already codified and approved this as the . . . expansion growth area" and that "there was no doubt that he was going to get the

approval, that he had to just go through the process to get it approved."  VII-2Tr. at 27, 32, 132; VII-Tr. 3 at 106.

Although the total size of the Paia Expansion Growth Area set forth in the Maui Island Plan is about 40 acres, only 33 of the 40 acres are located on the Property.  VII-1Tr. at 101, 103.  The total acreage of the Property located within the Expansion Growth Area affects the number of residential units and commercial lots that can be developed within the Expansion Growth Area.  *See id.* at 101-102.  This, in turn, affects the value projections of the project.  VII-2Tr. at 27-29.

In 2016, the Expansion Growth Area was not "essentially preapproved" for development because developing the Expansion Growth Area into residential and commercial lots requires consistency among the State land use district and the County plans and zoning "layers."  *See* VII-1Tr. at 48-49. Obtaining the appropriate designations involves environmental review and discretionary approvals and public hearings before several different governmental agencies, including a district boundary amendment from the State Land Use Committee, a change in zoning from the County Council, a community plan amendment from the County Council, and a SMA major permit from the Planning Commission.

Rory Rampton (Mr. Frampton) testified that, in 2016, the Expansion Growth Area was not essentially preapproved for development, explaining:

It only had the Maui Island Plan growth boundary, and that doesn't guarantee that you're going to get all the other layers approved. And by the other layers I'm meaning the State Land Use District Boundary needs to be changed, the Community Plan needs to be changed, the County zoning needs to be changed, and you need to obtain an SMA permit. So those are four major discretionary permits, if you will, or approvals that you would need in order to then be -- at that point, you could say you're essentially preapproved, because then after that, what's left are more ministerial type permits, like the subdivision process and your construction plans. So it wouldn't be until you've completed those four processes that you would be essentially preapproved.

*Id.* at 106; *see id.* at 122.

Mr. Spence similarly testified about what the Planning Department would have required in 2016 for the Expansion Growth Area to be essentially preapproved for development, including that the area would need to have the appropriate State District, Maui Island Plan, Community Plan, and County zoning designations in place, as well as the SMA permit. *Id.* at 53-54.

No County plan specifically anticipates approximately 275 residential units to be developed on the Property nor within the entire Expansion Growth Area. *Id.* at 102. Instead, the Maui Island Plan anticipates a total of 207 residential units, approximately 152 of which are potentially developable on the Property. *Id.* at 102-103.

No County plan specifically anticipates the development of 140 commercial lots on EC Paia's Property or in the entire Expansion Growth Area.

*Id.* at 103.  The Maui Island Plan does not anticipate any specific number of commercial lots.  *Id.* at 103.

Mr. Baskin admitted, "The only thing that I have is that the area was already in the Maui Island Plan as an area that was preapproved, meaning the location of that area was in the Maui Island Plan for expansion growth development."  VII-4Tr. at 100.

As to EC Paia's reliance on these statements, Mr. Adib explained that the 40-acre representation was important "[b]ecause if there had been more acreage in the Ag lot, then the value of the project is far less.  The more acreage you have in the growth area, that's where the high profit segment of the project is."  VII-2Tr. at 27-28.  He further explained the representation regarding 140 commercial lots was important "[b]ecause a larger portion of the profitability of the project was derived from the growth area, 140 commercial lots, as opposed to the 21 Ag lots[.]"  *Id.* at 29.

Regarding the representation that the Expansion Growth Area was essentially preapproved for development, Mr. Adib explained that it was "the wrap up of the presentation that had been previously made, that not only was this expansion area going to get a higher density entitlement for commercial and mixed use residential, but that since the County had already codified this in their Master Plan [] and the work that Mr. Baskin had done with the County, with his

professionals, that it was essentially preapproved," meaning "there was no doubt that he was going to get the approval, that he had to just go through the process to get it approved." *Id.* at 32.

Mr. Hirbod explained that EC Paia would not have done the deal if it had known the truth: "Because we went in there understanding and believing that the discretionary elements were done . . . the major portions of the discretionary elements of the urban growth area had been done[.]" *Id.* at 162-163; *see also id.* at 71-73.

### 3.   *Category 3: Affordable Housing*

The Investor Letter stated, "Under Hawaii law, developers offering affordable housing options are granted additional entitlement benefits, allowing for higher density and certain permitting process waivers to allow for faster development.  In general, affordable housing is defined as single-family dwelling units selling for 535,000 or less." JE-29 at ECP-001455.

The Investor Letter further stated that the "[c]urrent entitlements allow for approximately 385 residential units on the property as a whole.  Under current guidelines, dedicating 25% of those units to affordable housing stock would enable the development process, waivers and advantages so that, for example, one 15-acre Ag Lot could be developed with perhaps 100 affordable

housing units.  And the growth area commercial lots could support a variety of zero-lot-line multifamily units."  JE-29 at ECP-001455.

Mr. Baskin represented that he had worked with an affordable housing consultant and that these were the numbers and thresholds needed to get the developer benefits described.  VII-2Tr. at 36-37.  In meetings with EC Paia, Mr. Baskin further stated that affordable housing was a key component in executing the timeline of the project.  *Id.* at 37.

EC Paia understood that to entice the development of residential low-income housing, legislatures typically give bonuses of density and expedite approvals.  *Id.* at 34-35.  Mr. Adib explained that he understood Mr. Baskin's representations to mean Mr. Baskin had done the work and determined that it made sense to take one agricultural lot and dedicate it to affordable housing and that by doing so, it would increase the number of residential units EC Paia is able to develop and shorten the development time frame.  *Id.* at 36.

EC Paia considered the $535,000 price for affordable housing as represented by the Baskin Parties when evaluating the project because the higher the threshold, the less loss that EC Paia would take on in providing affordable units.  *Id.* at 35.

Mr. Frampton explained that state law and the County Code do not define affordable housing as "single family dwelling units selling for $535,000 or

less." VII-1Tr. at 108.  Instead, the County Code sets up different brackets for income levels of persons applying for homes that are based on a percentage of the median annual income.  *Id.* at 108-109.  The County then applies a formula that includes 30% of the annual income and the interest rate at the time.  *Id.* at 109.  Mr. Frampton explained that "when you have a series of high interest rates [like] right now, that same amount of income can buy a lot less of a house.  So the prices go down." *Id.* at 109.

Mr. Baskin never disclosed that 25 percent of market units is the minimum required for affordable housing or that it would require dedicating 51 percent of the total units in order to potentially obtain any waivers or bonuses. VII-2Tr. at 37; VII-1Tr. at 110.  Nor did Mr. Baskin disclose that any waiver or bonus requires discretionary approvals.  *See, e.g.*, JE-29 at ECP-001455.

### *Court's Findings as to Category 1-3 Statements*

The Court finds that, as to the Category 1-3 statements discussed above (AG Lots, Urban Growth Area, and Affordable Housing, respectively), the Baskin Parties generally may not have known the falsity of these statements or the statements did not relate to a past or existing fact.  That is, some statements reflect: (a) opinions and speculations, and other forward-looking statements, about the value, viability, and timelines to develop the Property; (b) incorrect numbers or calculations involving the Property; and (c) a misuse, mislabeling, or

misunderstanding of key terms, such as "development entitlement" and "pre-approved for development."  However, the Court finds that the Baskin Parties should have known that the statements reflecting inaccurate language, numbers, and calculations were false.

The Court next finds that EC Paia assumed a greater responsibility to conduct its own due diligence and fact-finding after EC Paia terminated the joint venture with the Baskin Parties, lost confidence in Mr. Baskin as a sponsor and partner for the project, and instead offered to buy the Baskin Parties' option to purchase the Property.

As to any statements that the Baskin Parties should have known were false in Categories 1-3, the Court finds that EC Paia either did not rely on these statements after EC Paia terminated the joint venture, attributed little weight to the statements, or, to the extent that EC Paia relied on any statements, EC Paia's reliance was not reasonable after it terminated the joint venture and moved away from Mr. Baskin as a sponsor and partner for the Project.

Mr. Baskin's statements in the Investor Letter supported a potential loan in October/November 2016.  Mr. Baskin then used the letter to attract a joint venture partner in the Property shortly thereafter.

EC Paia and Mr. Hirbod chose to reevaluate the deal as an assignment in the final days of A&B's option to Mr. Baskin, on or about December 14-15,

33

2016, when EC Paia terminated the joint venture with Mr. Baskin.  Mr. Hirbod

testified that he "lost confidence" in Mr. Baskin as a partner when EC Paia

terminated the joint venture; yet, Mr. Hirbod testified that he still relied upon

Baskin's statements in his Investor Letter from months earlier and Mr. Baskin's

information from the Appraisal and expert consultants.

  While the Court finds Mr. Hirbod and EC Paia witnesses credible

during the second (and first) phase of trial, it is difficult to believe that EC Paia and

Mr. Hirbod, a sophisticated businessman, terminated Mr. Baskin as a partner and

sponsor yet continued to rely on some of his imprecise language, easily refuted

numbers, and misinformation from months earlier.

  The Court finds that EC Paia and Mr. Hirbod's reliance on Baskin's

statements and information regarding Category 1-3 statements from months earlier

was not reasonable.

#### 4. Category 4: A Boutique Inn Was an Option

  The Baskin Parties next represented that boutique inns could be

developed within the Expansion Growth Area of the Property.

  In the Investor Letter, the Baskin Parties stated, "The roughly 40-acre

Growth Area lots will support dense commercial and multi-family residential

development that would provide an extension of the existing Paia town commercial

area.  Options would include . . . small specialty Boutique Inns[.]"  JE-29 at ECP-

001455.  The Project Video slides included with the Investor Letter highlighted "Paia's New Gateway," which included a "Boutique Inn."  JE-29 at ECP-001461.

The existence of a boutique inn was also represented to be a key component of the profitability of the Expansion Growth Area.  *See* JE-29 at ECP-1466 (hotel site proceeds included in present value calculation); *see also* VII-2Tr. at 38; *id.* at 54 (explaining that the ability to develop the hotel impacts the net present value because 13 million of the 23 million net present value is attributable to the development of an inn).

Mr. Baskin reiterated that a boutique inn would be approved within the Expansion Growth Area.  VII-2Tr. at 63, 132.  Mr. Baskin, as an innkeeper in the area, offered that there was a tremendous need on the North Shore for additional lodging units and that the boutique inn would be welcomed.  *Id.* at 38, 132.

The Appraisal analyzed the market for hotel-specific land in Hawai'i because the "subject's proposed Agricultural subdivision Lot 20 is proposed for a boutique hotel."  JE-58 at ECP-001532.  The Appraisal considered the approval and development of a boutique inn to determine the as-is value under the subdivision development method.  *Id.* at ECP-001559.  The Baskin Parties excerpted this portion of the Appraisal for inclusion in the Investor Letter.  JE-29 at ECP-001466.

Mr. Spence testified that in late 2016, the Planning Department did not view a boutique inn as an option for development on the Property. VII-1Tr. at 52. The Property's zoning designation did not allow for a boutique inn. *Id.* at 52-53. Even if the zoning was changed to a business country town zoning designation, which allows for a discretionary approval of an inn as a special use, and a special use permit was obtained, the Paia-Haiku Community Plan specifically prohibits hotels of any kind, including boutique inns. *Id.*

Mr. Adib explained, "[W]e believed [Mr. Baskin] . . . that those rooms were needed and that this was a key component for the high growth area profitability of the project." VII-2Tr. at 38. Mr. Hirbod explained, "It helps you bring in other, and attract other commercial tenants, and it also acts as a continuous cash flow." *Id.* at 132. Mr. Hirbod further testified that based on Mr. Baskin's representations, he believed that any risk regarding approval of a boutique inn had been resolved. VII-3Tr. at 105-106.

### 5. *Category 5: Water Available for the Development of the Property*

In the Investor Letter, the Baskin Parties stated, "The Property contains well sources providing substantial amounts of water for use in the development of the Property." JE-29 at ECP-001453. The plan concept and maps included with the investor materials also highlighted "existing wells." *See id.* at ECP-001463, ECP-001462.

36

In meetings and phone calls, Mr. Baskin reiterated that the Property has water available for development through the existing well.  *See, e.g.*, VII-2Tr. at 57-58.  For example, Mr. Baskin explained to EC Paia that one of the largest barriers to development in Maui is the availability of water and that through his work, he had solved the issue of water for the Property.  *Id.* at 23.

The Appraisal employed "the extraordinary assumption that there are adequate water supplies available to the subject site to support the proposed residential and commercial subdivision."  JE-58 at ECP-001476, ECP-001528; *see also id.* at ECP-001578 ("Prospective Market Value 'As Proposed' based on the Extraordinary Assumption that there is adequate water to support the proposed residential and commercial subdivision[.]").  The Appraisal emphasized the importance of not needing water meters for the project due to the existing well:

> **Agricultural Subdivision Infrastructure & Entitlement**
> A major development constraint in the local area is the requirement for water meters for residential lots. Due to the subject's productive agricultural well, water meters will not be necessary for the proposed Agricultural subdivision.

JE-58 at ECP-001528 (highlighting added).

At trial, Mr. Baskin admitted: "We would have provided information [to the appraiser] that there was an existing well on the property."  VI-3Tr. at 65.

A prerequisite to any subdivision on Maui is that the developer must prove that it has a long-term, reliable source of water to service the development.  VII-1Tr. at 93-94.  Mr. Frampton testified about the requirement for and difficulty in obtaining the required water source for any development in Maui.  *Id.*

After the deal closed, EC Paia hired a consultant who informed EC Paia that the quality of the water is such that it would be cost prohibitive to use the well for potable water.  VII-2Tr. at 24.

Mr. Frampton testified about his familiarity with the well and confirmed that it would not satisfy the Department of Health's criteria.  VII-1Tr. at 95.  He explained that it would be cost prohibitive to covert the well to a potable water source and that there is no other well on the Property.  *Id.* at 95.

Apart from their own representations in the Investor Letter and through the Appraisal, the Baskin Parties did not produce any document suggesting the well could be used for potable water or that water meters would not be needed for the agricultural subdivision.

Mr. Adib explained that the assumption of the availability of water was "a linchpin assumption."  VII-2Tr. at 57.  He reiterated that EC Paia considered the availability of water in evaluating the investment.  *Id.* at 58.

Mr. Adib explained that "Mr. Baskins [sic] had shared with us that the availability of water was key to any entitlement.  The entitlement wouldn't be successful because the availability of water is critical on Maui, and that he had done the work to determine that water was available for the Ag lot use, the commercial use of the urban growth area, and that box had been checked."  VII-2Tr. at 57-58.

Mr. Hirbod explained EC Paia would not have done the deal if it had known the truth: "Because we went in there understanding and believing that the discretionary elements were done, and that, at a minimum, the Ag lot portion would be administrative, and the major portions of the . . . discretionary elements of the urban growth area had been done.  And, really, most importantly, we have water.  So, no, we wouldn't."  VII-2Tr. at 163.

Insofar as the pre-existing well on the Property referenced by Mr. Baskin is inadequate for the development of the agricultural lots, the agricultural lot subdivision will require water meters.  VII-1Tr. at 93-99.  However, the County was not able to issue water meters for an agricultural lot subdivision in 2016 due to the available capacity of the system.  VI-1Tr. at 96.

At the time of the second phase of trial, EC Paia was still waiting on water meters from the County.  *See* VII-3Tr. at 47.  EC Paia had not been assured that it will receive water meters from the County, and it was possible that water meters would not be available for the 18-lot agricultural subdivision.  VII-1Tr. at 96.

The only other options for water for development are to dig another well on the Property, which is not optimal because of the water quality close to the shoreline, or reach an agreement with a neighboring landowner further inland to build a well on the neighbor's property.  VII-1Tr. at 97.  Both options would

require additional time and expense and discretionary approvals from the State of Hawaiʻi, Commission on Water Resource Management. *Id.* at 98-99. If EC Paia does not receive County water meters and is not able to proceed with one of the two new well options, EC Paia will not be able to complete the agricultural subdivision. *Id.* at 99.

For the Expansion Growth Area, EC Paia will also be required to identify a source of potable water, and if it is unable to do so, it will not be able to proceed with the development of the Expansion Growth Area. *Id.* at 99.

### *Court's Findings as to Category 4-5 Statements*

The Court finds that, as to the Category 4-5 statements (Boutique Inn and Potable Water, respectively), the Baskin Parties knew or should have known that these statements were false when they were made.

The Court finds that, as to the Category 4-5 statements, the statements relate to a past or existing material fact.

The Court finds that Mr. Baskin, as an inn keeper in the area, knew or should have known that the development of the Property would not include "boutique inns" as he said it could.

The Court similarly finds that the Baskin Parties failed to understand the water needed for development of the Property, as Mr. Baskin made assurances

about the existing water on the property, particularly the water needed to develop the agricultural lots.

The Court finds that Mr. Baskin's testimony about water available for the development was not credible and was negligent considering his lack of understanding about a development project with the size and complexity of the Property.

As to any statements that Baskin Parties knew or should have known were false in Categories 4-5 statements, the Court finds that EC Paia did rely on these statements and its reliance was reasonable.  In addition to Mr. Hirbod and Mr. Adib's testimony that EC Paia relied on the Baskin Parties' representations, the Court finds EC Paia's reliance reasonable considering the level of detail in the Investor Letter and the assumptions in the Appraisal that were provided to the appraiser by Mr. Baskin, and Mr. Baskin holding himself out as an experienced innkeeper and businessman who did the leg work for the project.

### 6.    *Category 6: A&B had a Backup Offer*

At the time of the parties' negotiation of the assignment, Mr. Baskin told Mr. Hirbod that Mr. Endo had informed him that A&B had a backup offer from another buyer.  Mr. Hirbod testified that he understood the term "backup offer" to mean that in the event the PSA was terminated, A&B would be

contractually obligated to sell the Property to the backup offeror.  VII-2Tr. at 155-156, 160, 169; *see also* VII-1Tr. at 17-18.

Mr. Endo testified that he never represented to Mr. Baskin that there was a backup offer for the Property.  VII-1Tr. at 18.  He further testified that no one at A&B told Mr. Baskin that there was a backup offer, as he was the only person who had been speaking with Mr. Baskin on the deal.  *Id.* .

Mr. Baskin admitted that, to have EC Paia increase the price it would pay for the assignment of the PSA, he "was able to convince [Mr. Hirbod] . . . that there were other backup offers or other parties interested."  VI-2Tr. at 175.

Mr. Baskin admitted that Mr. Hirbod upped his offer from $1 million to $4 million based on the purported backup offer.  *Id.* at 175 ("[I]t started with we'll give you a million dollars to assign it to us.  I had a discussion with Sam, and I was able to convince him, I believe, that there were other backup offers or other parties interested.  And so we had a discussion in that, you know, he said, okay, fine.  And he came up to $4 million as a number to assign it[.]").

At trial, Mr. Hirbod testified that Mr. Baskin had represented that A&B had a backup offer and that he and Mr. Baskin would lose the Property if Mr. Hirbod did not purchase it from Mr. Baskin.  Mr. Hirbod relied on Mr. Baskin's representation about the backup offer in continuing to negotiate the PSA.

Mr. Hirbod upped his offer from $1 million and a parking lot license to $4 million, a parking lot license, and the obligation in the Land Agreement to provide Mr. Baskin a Residential Lot and a Commercial Lot.  VII-2Tr. at 153-156, 167.

### *Court's Findings as to Category 6 Statements*

The Court finds that, as to the Category 6 statements (Backup Offer), Mr. Baskin knew or should have known that these statements were false when they were made.

The Court finds that, as to the Category 6 statements (Backup Offer), the statements relate to a past or existing material fact.

The Court finds that Mr. Baskin deliberately stated to Mr. Hirbod of EC Paia that A&B had a backup offer to create urgency, keep himself (Mr. Baskin) in the deal, and increase the consideration from EC Paia for the sale of Mr. Baskin's option to buy the Property from A&B.

As to any statements that Mr. Baskin knew and should have known were false in Categories 6 statements, the Court finds that EC Paia did rely on these statements and its reliance was reasonable.  In addition to Mr. Hirbod and Mr. Adib's testimony that EC Paia relied on the Baskin Parties' representations, the Court finds EC Paia's reliance reasonable because of its time invested in learning about the Property and the potential value in developing the Property.

### C.   **Causation**

The Court finds that EC Paia's damages were directly and
proximately caused by the misrepresentations that a boutique inn could be
developed within the Expansion Growth Area of the Property, that water was
available for the development of the Property, and that there was a backup offer at
the time the parties were negotiating the assignment.

### D.   **EC Paia Was Damaged by Mr. Baskin's Misrepresentations**

The Court finds that EC Paia suffered damages from reasonably
relying on the misrepresentations set out above.

EC Paia paid $4 million to Mr. Baskin, up from Mr. Hirbod's initial
offer of $1 million, at the closing of the transaction.  EC Paia also agreed to the
obligations under the Land Agreement and Parking Lot Agreement at the closing
of the transaction.  Generally, under the Land Agreement, EC Paia agreed to
transfer to Mr. Baskin a Residential Lot and a Commercial Lot after the Property is
further developed and subdivided, and, under the Parking Lot Agreement, EC Paia
agreed to lease a parking lot to certain Baskin Parties.

IV.   **CONCLUSIONS OF LAW**

A.   **Jurisdiction**

Complete diversity exists.  Accordingly, this court has diversity jurisdiction over this case.

B.   **Liability**

A claim for intentional misrepresentation requires showing (1) false representations were made by the counterclaim-defendants; (2) with knowledge of their falsity; (3) in contemplation of the counter-claim plaintiff's reliance; and (4) the counter-claim plaintiffs' reasonable reliance.  *See Philadelphia Indem. Ins. Co. v. Ohana Control Sys., Inc.*, 289 F. Supp. 3d 1141, 1151 (D. Haw. 2018); *Long v. Deutsche Bank Nat. Tr. Co.*, No. 10-00359-JMS/KS, 2011 WL 5079586, at *8 (D. Haw. Oct. 24, 2011).

Under Hawaiʻi law, "intentional" misrepresentation is essentially the same cause of action as "fraudulent" misrepresentation.  *See Sung v. Hamilton*, 710 F. Supp. 2d 1036, 1046 n.6 (D. Haw. 2010) (citations omitted).  Fraud can be committed "by nondisclosure as well as by an affirmative misrepresentation."  *See id.* at 1047 (citation omitted).

A negligent misrepresentation claim has the same elements as an intentional misrepresentation claim except that it only requires the absence of a

reasonable ground for believing the statement to be true rather than knowledge of its falsity.  *See Philadelphia Indem.*, 289 F. Supp. 3d at 1151.

The general rule for actionable false representations is that they must relate to a past or existing material fact and not the occurrence of a future event.  *See Shoppe v. Gucci America, Inc.,* 94 Hawaiʻi 368, 386 (2000).  However, there is an exception to the general rule for false predictions or opinions, where the statements are predicated on misrepresentations of existing material facts.  *See* 37 C.J.S. Fraud § 24 ("Redress will also not be refused … where the prediction or promise necessarily includes a misstatement of the existing facts on which it is based.") (*citing John Hancock Mut. Life Ins. Co. v. Weisman*, 27 F.3d 500, 504 (10th Cir. 1994) ("[A]n opinion or prediction can be a misrepresentation to the extent that is a misstatement of the facts underlying it.").

Thus, "[w]here an opinion purports to be based on facts, or where the opinion could not have been true based on facts known to the defendant, the opinion is actionable."  *Thrivent Fin. for Lutherans v. Countrywide Fin. Corp*., No. 2:11-CV-07154-MRP, 2012 WL 1799028, at *4 (C.D. Cal. Feb. 17, 2012); *see also United States v. Paulus*, 894 F.3d 267, 275 (6th Cir. 2018) ("[O]pinions are not, and have never been, completely insulated from scrutiny.  At the very least, opinions may trigger liability for fraud when they are not honestly held by their

maker, or when the speaker knows of facts that are fundamentally incompatible with his opinion.") (citing Restatement (Second) of Torts § 539(1)(a)).

As set out above, the Baskin Parties made several material misrepresentations related to past or existing material facts that are actionable.  At the time the Baskin Parties made the false representations to EC Paia and failed to accurately disclose material facts related to the Property, Mr. Baskin knew or should have known that the representations were false and that he was failing to disclose material facts.

Alternatively, the representations and failures to disclose material facts described above were a result of Mr. Baskin's failure to exercise reasonable care or competence in communicating the information.

Mr. Baskin contemplated and knew or should have known that EC Paia would rely on the misrepresentations and that EC Paia would have considered the undisclosed facts to be material to its decision to purchase the Property and enter into the Agreements.

Justifiable reliance is "a question of fact that assesses all of the circumstances of a particular case rather than incorporating a purely objective standard." *Greys Ave. Partners, LLC v. Theyers*, 484 F. Supp. 3d 895, 903 (D. Haw. 2020) (emphasis added).  "Relevant circumstantial considerations include the parties' (1) relative knowledge of the facts available, (2) opportunity to investigate

the facts, and (3) prior business experience." *Honolulu Disposal Serv., Inc. v. Am. Ben. Plan Adm'rs, Inc.*, 433 F. Supp. 2d 1181, 1191 (D. Haw. 2006) (internal quotations and citations omitted).  Party sophistication does not preclude a finding of justifiable reliance.  *See e.g.*, *Santiago v. Tanaka*, 137 Hawai'i 137, 153 (2016); *Honolulu Disposal Serv.,* 433 F. Supp. 2d at 1192.

"[T]he duty to avoid misrepresentations is so strong that the deceived party is not charged with failing to discover the truth."  *Santiago*, 137 Hawai'i at 153 (2016) (internal brackets omitted) (citations omitted).

Accordingly, in light of the Court's findings above, the Court concludes that the Baskin Parties are liable for intentional and/or negligent misrepresentations and nondisclosures as to Category 4-6 statements.

## C.  <u>**Damages**</u>

As a direct, proximate, and foreseeable result of the Baskin Parties' material misrepresentations and failure to disclose, EC Paia has been damaged.

The Court finds it difficult, based upon the evidence received at trial, to attribute consequential damages to any of the misrepresentations other than the backup offer.

### 1.   *Non-Monetary Damages*

The Court finds that the consequential damages of the

misrepresentations directly attributable to Mr. Baskin's misrepresentation about the

backup offer include:

    a. EC Paia's remaining obligations in the Land Agreement, that is, to transfer one Commercial Lot and one Residential Lot when developed.

    b. EC Paia's remaining obligations in the Parking Lot Agreement, as those terms were added to the $1 million offer after Mr. Baskin's misrepresentation about the backup offer.

As referenced in the Credibility Findings section above, the parties

hold vastly different views of many aspects covered in the two phases of trial.  For

example, Mr. Baskin and EC Paia principals do not agree whether a "residential

lot" under the Land Agreement means, as Mr. Baskin says, one of the 18

agricultural lots on the Property or, as EC Paia holds, one of the residential lots in

the Urban Growth Area.  Because this Court heard testimony about the relative

value, likelihood, and timing of developing the Urban Growth Area, it is clear that

Mr. Baskin and EC Paia principals do not agree on the value, or prospective value,

of the residential lot owed to Mr. Baskin under the Land Agreement.  The

Commercial Lot is also connected to the value, likelihood, and timing of developing the Urban Growth Area.

Accordingly, the Court finds that the parties would not agree on the relative value of the non-monetary damages set out above.  That is, Mr. Baskin may believe that the consequential damages imposed above amount to tens of millions of dollars; whereas, EC Paia may consider the non-monetary damages to be speculative and not as valuable.

### 2.   *Monetary Damages*

EC Paia argues that another $3 million, which reflects the increase from the initial $1 million offer to $4 million after Mr. Baskin falsely stated there was a backup offer, should be included in the damages.  The Court disagrees.

The Court finds that EC Paia entertained the PSA proposed by Mr. Baskin, even after EC Paia terminated the joint venture and lost confidence in Mr. Baskin as a sponsor and a partner because EC Paia still thought it was a good deal as a developer, not merely an equity investor.  The Court finds that EC Paia's $1 million initial offer was not based upon any true valuation or other traditional factors.  The Court finds that EC Paia likely would have increased its monetary offer from $1 million (towards $4 million) even without Mr. Baskin's misrepresentation about the backup offer.

While Mr. Hirbod may have paid more money to Mr. Baskin for the option to buy the Property, the Court finds that it was the obligations in the Land Agreement and the Parking Lot Agreement that were more directly attributable to the misrepresentation about the backup offer.

The Court finds that EC Paia and Mr. Hirbod were interested in pursuing the property without Mr. Baskin as sponsor.  At the time EC Paia terminated the joint venture and negotiated the PSA with Mr. Baskin, Mr. Hirbod and others at EC Paia had formed opinions about Mr. Baskin and his potential as a sponsor and partner, and Mr. Hirbod knew that Baskin's vision for the project was aspirational and maybe even ill-informed.

EC Paia and Mr. Hirbod likely viewed Mr. Baskin's $10 million purchase price as a great deal and Mr. Baskin's information and statements about the project were mere factors in EC Paia's decision to proceed with the assignment (and without Baskin as sponsor).

The Court finds EC Paia's monetary damages are the following:

a. The $300,000 deposit that EC Paia reimbursed to Mr. Baskin that he paid to A&B for the option to purchase the Property.

b. The $65,762.39 for expenses that could be substantiated at the time of closing that EC Paia reimbursed to Mr. Baskin; and

c. an additional $300,000.

51

Accordingly, the Court orders that (1) the Baskin Parties pay EC Paia $665,762.39, (2) EC Paia no longer has any obligation to transfer a Residential Lot and a Commercial Lot to the Baskin Parties, and (3) EC Paia no longer has any obligation to lease the Baskin Parties a parking lot pursuant to the Parking Lot Agreement.

### 3. *Punitive Damages*

"Punitive damages are typically appropriate when allegations of malicious conduct or 'willful and wanton conduct in reckless disregard of rights or interests' can be proven." *Television Events & Mktg., Inc. v. Amcon Distrib. Co.*, 488 F. Supp. 2d 1071, 1083 (D. Haw. 2006) (quoting *Masaki v. General Motors Corp.*, 71 Haw. 1, 10, 780 P.2d 566, 572 (1989)). "[T]he proper measurement of the amount of punitive damages is the degree of the defendant's malice, oppression, or gross negligence that forms the basis for liability for punitive damages and the amount of money required to punish the defendant." *Id.* (internal quotations and citations omitted).

Although EC Paia has limited its claim of punitive damages to nominal damages, *see, e.g.*, VII-2Tr. at 165 (Mr. Hirbod requesting nominal punitive damages), the Court does not find an award of nominal punitive damages to be appropriate here.

## V.  **JUDGMENT**

The Court ORDERS that Judgment be entered in favor of Defendant and against Plaintiffs on Defendant's counterclaims in the amount of $665,762.39. The Court also rules that Defendant no longer has any obligation to transfer a Residential Lot and a Commercial Lot to the Baskin Parties, or to lease the Baskin Parties a parking lot pursuant to the Parking Lot Agreement.  The Clerk of Court is DIRECTED to enter Judgment and close this case.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, July 25, 2024.

_____
Wes Reber Porter
United States Magistrate Judge

Baskin, et al. v. EC PAIA, LLC.; Civ. No. 20-00216 WRP; FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEFENDANT'S COUNTERCLAIMS.